# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### AT URBANA

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

SARAH M. NIXON,

      Defendant.

Case No. 15-cr-20057

## PLAINTIFF UNITED STATES OF AMERICA'S OPPOSITION
## TO DEFENDANT'S MOTION TO UN-REDACT

JOHN C. MILHISER
*United States Attorney*

W. SCOTT SIMPSON
*Assistant United States Attorney*

*Office of the United States Attorney*
*318 South Sixth Street, Room 220*
*Springfield, Illinois 61602-1806*
*Telephone:  217-492-4413*
*Email:        w.scott.simpson@usdoj.gov*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

   I.   Procedural History ..................................................................................... 3

   II.  Federal Agencies and Components ........................................................... 5

   III. Documents in Dispute .............................................................................. 7

        A.   Tim Bass/OIG Emails (Doc. 201, Pages 1-279) ....................... 7

        B.   Tim Bass/PRAO Email (Doc. 201, Pages 280-296) .................. 8

        C.   Bass/Pierson Emails (Doc. 201, Pages 297-304) ...................... 8

        D.   Lisa Hopps Memorandum to EOUSA (Doc. 201, Pages 305-310) ........ 9

        E.   Email Summarizing Judge's Feedback on AUSA
            Performance (Doc. 201, Pages 3721-3722) ................................ 9

ARGUMENT ......................................................................................................... 10

   I.   Governing Legal Principles .................................................................... 10

        A.   Relevance .................................................................................. 10

        B.   Work-Product Doctrine .............................................................. 11

        C.   Attorney-Client Privilege ........................................................... 14

        D.   Deliberative-Process Privilege ................................................... 16

        E.   Grand-Jury Secrecy ................................................................... 19

        F.   Privacy Act ................................................................................. 21

i

G.    Personal Privacy: Other Employment Records .................................... 22

H.    Personal Privacy and Security: Identities of OIG Employees ............. 23

II.  Most of the Content of the Tim Bass/OIG Emails Is Irrelevant, and
Portions of Them Are Protected by the Work-Product Doctrine, Grand-
Jury Secrecy, the Privacy Act, and Personal Privacy and Security ............. 24

III. The Tim Bass/PRAO Email Is Protected by the Attorney-
Client Privilege and the Work-Product Doctrine, and Most
of Its Content Is Irrelevant ................................................................ 28

IV. The Bass/Pierson Emails Are Protected by the Work-Product
Doctrine, and Most of Their Content Is Irrelevant ........................................ 30

V.  The Lisa Hopps Memorandum to EOUSA Is Protected by the
Deliberative-Process Privilege and the Work-Product Doctrine,
and Much of Its Content Is Irrelevant ............................................. 31

VI. The Email Summarizing a Judge's Feedback on AUSA Performance
Is Protected by the Deliberative-Process Privilege and Personal
Privacy, and Is Irrelevant ................................................................... 33

CONCLUSION ......................................................................................... 35

## INTRODUCTION

The United States, by its undersigned counsel, responds as follows to "Defendant's Motion to Un-redact." Doc. 197.

In support of her pending motion for new trial, the defendant Sarah M. Nixon seeks to compel the unredacted production of five documents or sets of documents as to which the government has invoked certain privileges and other protections. The subject documents are (A) a series of emails in which an Assistant United States Attorney ("AUSA") asked the Inspector General of the Department of Justice ("DOJ" or "Department") to undertake an investigation; (B) a subset of item A in which the AUSA forwarded some of his emails to the DOJ Professional Responsibility Advisory Office; (C) an email exchange in which two AUSAs discussed how to handle a certain issue in litigation; (D) a memorandum in which a paralegal in the U.S. Attorney's office asked the Executive Office for United States Attorneys to take certain action in relation to a case unrelated to this one; and (E) an email in which a supervisory AUSA summarized a district judge's feedback on the performance of an AUSA under his supervision.

These documents, to the extent the government has redacted them, are either irrelevant, covered by privileges or other protections, or both. First, in identifying documents to provide to this Court and the Court of Appeals reflecting communications between Judge Colin Bruce and the United States Attorney's office, the

office erred on the side of inclusion. Much of the content of the subject docu-

ments is not relevant to Nixon's motion for new trial under the governing law.

The documents mostly relate to another case – *United States v. Aaron J. Schock*, No.

16-cr-30061 (C.D. Ill.) – rather than this case, and reflect no communications

between Judge Bruce and the U.S. Attorney's office, on which Nixon's motion for

new trial is based.

Second, many of these communications reflect the thought processes and

mental impressions of attorneys and other legal representatives regarding

litigation, and are thus protected by the work-product doctrine. *See Sandra T.E. v.

S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 621-22 (7th Cir. 2010). Third, item A above

– the emails to the DOJ Office of the Inspector General ("OIG") – include

transcripts of grand jury proceedings, which are protected by grand jury secrecy.

*See Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979). Fourth, item

A also includes an employee's personal performance appraisal, which is

protected by the Privacy Act, 5 U.S.C. § 552a.

Fifth, item B, the emails forwarded to the Professional Responsibility

Advisory Office, are also protected by the attorney-client privilege, because that

Office is responsible for advising AUSAs and other DOJ attorneys on issues

regarding professional responsibility issues. *See United States v. Rowe*, 96 F.3d

1294, 1296 (9th Cir. 1996); *Nesse v. Pittman*, 206 F.R.D. 325, 329 (D.D.C. 2002).

Sixth, items A and B include the names of OIG employees, which must be redacted to avoid "subject[ing] them to harassment and annoyance in the conduct of their official duties and in their private lives." *Miller v. Bell*, 661 F.2d 623, 630 (7th Cir. 1981), *abrogated on other grounds by DOJ v. Landano*, 508 U.S. 165 (1993).

Seventh, item D, the memorandum to the Executive Office for United States Attorneys, is part of a process of deciding whether to take official government action, and is thus protected by the deliberative-process privilege. *See Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370, 374-75 (7th Cir. 2004). And finally, item E, the email summarizing a judge's feedback on the performance of an AUSA, is protected by that employee's "privacy interest in his or her employment history and job performance evaluations." *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984).

The government has submitted marked but unredacted versions of these documents under seal so the Court can review them in camera and satisfy itself as to the validity of the arguments set forth below. Doc. 201.

## BACKGROUND

### I. Procedural History

The defendant has filed a motion for new trial based on certain communications between the United States Attorney's office and Judge Colin Bruce, who

presided over the trial in this case. Doc. 173. Nixon asserts that those communi-
cations show a "disqualifying bias against her and in favor of the government"
on Judge Bruce's part. *Id*. at 1-2. Judge Bruce's communications were also the
subject of complaints before the Court of Appeals. *See In re Complaints Against
District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067 (7th Cir. Judicial
Council May 14, 2019).

The U.S. Attorney's office provided several documents to this Court and to
the Court of Appeals in connection with Nixon's motion for new trial and the
Seventh Circuit complaints. *Id*.; Docs. 183, 185, 188. Because of their sensitivity,
the United States has given redacted versions of the documents to counsel for
Nixon, invoking the work product doctrine and other privileges. Docs. 192, 193,
195, 196. The Judicial Council of the United States Court of Appeals for the
Seventh Circuit has resolved the judicial complaints, *see In re Complaints Against
District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067, but Nixon's motion
for new trial remains pending before this Court.

Nixon now seeks to compel the unredacted production of some of the
redacted documents. Doc. 197. To facilitate this Court's review of the challenged
redactions, the United States filed on November 15, 2019, ex parte and under

seal, marked copies of the documents that show each redaction the government made in providing the documents to the defense. Doc. 201.[1]

## II. Federal Agencies and Components

The disputed documents refer to the following federal agencies and components:

The Department of Justice, headed by the Attorney General, conducts litigation on behalf of the United States and provides legal advice to Executive Branch agencies. 28 U.S.C. §§ 512, 516, 517. The United States Attorney for the Central District of Illinois, under the direction of the Attorney General, is responsible for prosecuting "all offenses against the United States" and for "prosecut[ing] or defend[ing] . . . all civil actions, suits or proceedings in which the United States is concerned" within his district. *Id.* §§ 519, 547.

The Executive Office for United States Attorneys ("EOUSA") supports and provides services to the various U.S. Attorney's offices, including serving as a "close liaison" between each office and DOJ. *See* Mission and Functions, https://www.justice.gov/ usao/ eousa/ mission-and-functions (last visited

---

[1] In the in camera submission, material in the documents that is outlined in orange was redacted in the copies provided to counsel for Nixon. Material that is not outlined in orange was not redacted. The added comments explaining the redactions (for example, "Lack of relevance: potential internal government investigations; no reference to communications between CSB and USAO") were included in the copies provided to defense counsel.

Nov. 13, 2019). EOUSA also "[c]ordinate[s] and direct[s] the relationship of the Offices of the U.S. Attorneys with other organizational units of the Department of Justice." *Id*.

The DOJ Office of the Inspector General conducts audits and investigations regarding the programs and operations of the Department. 5 U.S.C. App. 3 §§ 2, 4, 8E(b). OIG "may receive and investigate complaints or information from [any DOJ employee] concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety." *Id*. § 7(a). OIG reports the results of its investigations and makes recommendations for corrective action. *Id*. §§ 5, 6(a)(2). OIG *may* refer allegations of "criminal wrongdoing or administrative misconduct" to the DOJ Office of Professional Responsibility ("OPR")[2] or to the internal affairs office of the appropriate DOJ component, and OIG *must* refer to OPR any allegations of misconduct by DOJ attorneys and certain other personnel involving the exercise of authority to "investigate, litigate, or provide legal advice." *Id*. § 8E(b)(2), (3).

The DOJ Professional Responsibility Advisory Office ("PRAO") "[p]rovide[s] advice to [DOJ] attorneys and the leadership of the Department on issues relating

---

[2] OPR investigates allegations of "professional misconduct" by DOJ employees. *See* About OPR, https://www.justice.gov/opr/about-opr (last visited Nov. 13, 2019).

to professional responsibility." *See* About the Office, https://www.justice.gov/prao/ about-office (last visited Nov, 13, 2019).[3]

## III. Documents in Dispute

### A. Tim Bass/OIG Emails (Doc. 201, Pages 1-279 [Attachment 1])[4]

AUSA Tim Bass and OIG exchanged a series of emails in December 2017 and January 2018, in which Mr. Bass asked OIG to investigate alleged wrongdoing by certain personnel at the U.S. Attorney's office in connection with *United States v. Aaron J. Schock*, No. 16-cr-30061 (C.D. Ill.), the prosecution of a former U.S. congressman for various offenses in connection with the misuse of public and campaign funds. The exchange included several attachments, including (1) communications among AUSA Bass; Patrick Hansen, then Acting United States Attorney; John Childress, then Criminal Chief; and other personnel in the office, regarding the handling of *Schock* and the drafting of filings for that case; (2) transcripts of grand jury proceedings in *Schock*; (3) a performance appraisal

---

[3] Another component of DOJ in Washington, D.C., the Public Integrity Section of the Criminal Division, "oversees the federal effort to combat corruption through the prosecution of elected and appointed public officials at all levels of government." *See* Public Integrity Section, https://www.justice.gov/criminal/pin (last visited Nov. 13, 2019).

[4] Unmarked versions of the first four groups of documents described below (items A through D) were filed ex parte and under seal on January 31, 2019 (Doc. 188). The page numbers and attachment numbers used here are the same as those used in docket #188.

for AUSA Bass covering January through December 2016; and (4) several documents filed in the *Schock* case. The United States has disclosed the filed documents to Nixon without redaction. These documents total 279 pages.

### B. Tim Bass/PRAO email (Doc. 201, Pages 280-296 [Attachment 2])

AUSA Bass forwarded some of the emails described immediately above (Pages 30-46) to PRAO in December 2017; that is, Mr. Bass forwarded to PRAO some of the emails in which he asked OIG to investigate alleged wrongdoing in connection with *Schock*. Thus, except for the email header reflecting the forward to PRAO, these documents are a duplicate of part of the Tim Bass/OIG Emails. These documents total seventeen pages.

### C. Bass/Pierson Emails (Doc. 201, Pages 297-304 [Attachment 3])

AUSA Bass, who handled the *Schock* case, and AUSA Elly Pierson, who handled this action, exchanged emails in May 2018 in which they discussed what to do about a December 2016 email exchange between Judge Colin Bruce and Lisa Hopps, a paralegal in the U.S. Attorney's office. The United States has disclosed the Bruce/Hopps exchange itself to Nixon without redaction (except for a phone number). The Bass/Pierson Emails (including the Bruce/Hopps exchange) total eight pages.

### D. Lisa Hopps Memorandum to EOUSA (Doc. 201, Pages 305-310 [Attachment 4])

Lisa Hopps sent a memorandum to Norman Wong, Principal Deputy Director

of EOUSA, in August 2018. The purpose of Ms. Hopps's communication was to

ask EOUSA and the Department of Justice to take certain action regarding *Schock*.

This document is six pages long.

### E. Email Summarizing Judge's Feedback on AUSA Performance (Doc. 201, Pages 3721-3722 [Attachment 5])[5]

Eugene Miller, a supervisory AUSA, sent an email to himself in April 2016,

summarizing and recording Judge Bruce's oral feedback regarding the perform-

ance of another AUSA in the office. The judge provided feedback regarding that

AUSA's work in general, across various cases. Although the email mentions two

specific cases, it does not mention this case, *United States v. Nixon*.[6] This

document is two pages long.

---

[5] An unmarked version of this document was filed ex parte and under seal, along with other documents (not involved in Nixon's motion to compel), on January 23, 2019 (Docs. 183, 185). The page numbers used here are the same as those used in the January 23 filings.

[6] AUSA Miller forwarded the above-described email to AUSA Greggory Walters, Appellate Chief in the U.S. Attorney's office, in September 2018. Mr. Walters was then assisting with the collection of documents reflecting communications between Judge Bruce and employees in the U.S. Attorney's office. *See In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053 & 07-18-90067, at 3 (7th Cir. Judicial Council May 14, 2019). Mr. Miller's covering email to Mr. Walters is redacted in its entirely, given that it merely reflects the internal collection of documents.

# ARGUMENT

Under the following legal principles and for the reasons explained below, Nixon's motion to compel the unredacted production of documents should be denied.

## I.   Governing Legal Principles

### A.  Relevance

On a motion for new trial under Rule 33 of the Federal Rules of Criminal Procedure, a court should consider only relevant evidence. *See United States v. Blackwell*, 459 F.3d 739, 768-79 (6th Cir. 2006) (holding that evidence of juror misconduct was irrelevant to defendant's motion for new trial based on newly discovered evidence). Where the defendant seeks a new trial based on an allegation that the presiding judge was actually or presumptively biased, the defense "must offer either direct evidence or a possible temptation so severe that [the appellate court] might presume an actual, substantial incentive to be biased." *Franklin v. McCaughtry*, 398 F.3d 955, 960 (7th Cir. 2005) (internal quotation marks omitted). The Supreme Court has found presumptive bias where (1) the judge had a direct, personal, or substantial pecuniary interest in the outcome of the case; (2) the judge had been the target of personal abuse or criticism from the party before him; or (3) the judge had the dual role of investigating and adjudicating disputes and complaints. *See, e.g., Aetna Life Ins. Co. v. Lavoie*, 475

U.S. 813, 824-25 (1986) (holding that justice's interest in case was "direct, personal, substantial, and pecuniary"); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (noting that bias may be presumed where judge has been "target of personal abuse or criticism from the party before him"); *In re Murchison*, 349 U.S. 133, 139 (1955) (same judge presided over grand jury and trial). Evidence that does not speak to these factors or tend to show actual bias is irrelevant.

## B.  Work-Product Doctrine

The work-product doctrine "protects documents prepared by an attorney or the attorney's agent to analyze and prepare the client's case." *United States v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). The purpose of the doctrine is to establish a "zone of privacy" to prepare for adversarial proceedings "free from scrutiny or interference by an adversary." *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006). It also prevents a party from "taking a free ride on the research and thinking of his opponent's lawyer." *United States v. Frederick*, 182 F.3d 496, 500 (7th Cir. 1999). The doctrine "advances the adversarial system by providing incentives to collect information and thoroughly prepare for litigation." *Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1024-25 (7th Cir. 2012). *See generally Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1417 (3d Cir. 1991) ("Although some writers refer to a work-product 'privilege,' we prefer the term 'doctrine,' for the doctrine

11

encompasses both a limited immunity from discovery and a qualified evidentiary privilege.").

The work-product doctrine applies where the documents at issue "can fairly be said to have been prepared or obtained because of the prospect of litigation." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 622 (7th Cir. 2010). It also protects documents created during "actual ongoing litigation." *Harper v. United States Beef Corp.*, No. 15-3112, 2018 WL 3863525, at *2 (C.D. Ill. July 20, 2018). "Litigation" for this purpose means any "adversarial proceeding[]." *See Christman v. Brauvin Realty Advisors, Inc.*, 185 F.R.D. 251, 255 (N.D. Ill. 1999); *see also McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 262 (N.D. Ill. 2000) (holding that appeal to Board of Patent Appeals and Interferences, although ex parte, was sufficiently adversarial that doctrine applied). The doctrine always forecloses compelled disclosure of "thought processes and mental impressions," *Sandra T.E.*, 600 F.3d 621-22, whereas a court may order disclosure of any severable factual content upon a showing of "substantial need" and an inability to obtain the "substantial equivalent" by other means without "undue hardship." *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 768 (7th Cir. 2006). "Although the work-product doctrine most frequently is asserted as a bar to discovery in civil litigation, its role in assuring the proper functioning of the criminal justice system is even more vital." *United States v. Nobles*, 422 U.S. 225, 238 (1975).

12

While this doctrine usually focuses on the work of attorneys, it also applies to the work of other party representatives. As the Supreme Court has said, "One of [the] realities [of litigation] is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. It is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *Nobles*, 422 U.S. at 238-39. Thus, for example, the doctrine applies to the work product of a paralegal, "whether the paralegal is viewed as an extension of the attorney or as another representative of the party itself." *Fine v. Facet Aerospace Prods. Co.*, 133 F.R.D. 439, 445 (S.D.N.Y. 1990); *see United Coal Companies v. Powell Const. Co.*, 839 F.2d 958, 966 (3d Cir. 1988) (work-product doctrine can apply to mental impressions of party representatives other than attorneys); *NLRB v. Jackson Hosp. Corp.*, 257 F.R.D. 302, 310 (D.D.C. 2009) (applying work-product doctrine to work of law clerks).

Finally, the protection of work product "endures after termination of the proceedings for which the documents were created, especially if the old and new matters are related." *Hobley*, 433 F.3d at 949; *see In re Grand Jury Proceedings*, 43 F.3d 966, 971 (5th Cir. 1994) (collecting cases); *see also FTC v. Grolier Inc.*, 462 U.S. 19, 25 (1983) ("[T]he literal language of [Fed. R. Civ. P. 26(b)(3)] protects

materials prepared for any litigation or trial as long as they were prepared by or for a party to the subsequent litigation.").

## C. Attorney-Client Privilege

"The attorney-client privilege protects communications made in confidence by a client [or] a client's employees to an attorney, acting as an attorney, for the purpose of obtaining legal advice." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010). The purpose of this privilege is to "encourage full disclosure and to facilitate open communication between attorneys and their clients." *United States v. BDO Seidman*, 337 F.3d 802, 810 (7th Cir. 2003). "Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007). The attorney-client privilege applies to government agencies and employees just as to private entities and persons. *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169-70 (2011); *see also United States v. Zingsheim*, 384 F.3d 867, 871 (7th Cir. 2004) ("The attorney-client privilege covers conversations between the prosecutors (as attorneys) and client agencies within the government.").

14

To determine whether a communication is covered by this privilege, a court considers "(1) whether legal advice of any kind was sought from a professional legal adviser in his capacity as such; and (2) whether the communication was related to that purpose and made in confidence by the client." *Sandra T.E.*, 600 F.3d at 618 (brackets, ellipses, and internal quotation marks omitted). The privilege applies to any "confidential communication between attorney and client if the communication was made for the purpose of obtaining or providing legal advice." *FTC v. Boehringer Ingelheim Pharm., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018).

For purposes of this privilege, an attorney-client relationship exists between an organization's employees and its in-house counsel. Indeed, in its seminal decision on the attorney-client privilege, the Supreme Court held that the privilege protected questionnaire responses that employees of a company's foreign subsidiaries had sent to the company's general counsel. *Upjohn Co. v. United States*, 449 U.S. 383, 386-97 (1981). Further, attorneys in a law firm seeking legal advice from others in the firm, including advice regarding ethical issues, are clients of the latter for purposes of the attorney-client privilege. *See United States v. Rowe*, 96 F.3d 1294, 1296 (9th Cir. 1996) (reversing order requiring attorneys to comply with subpoena); *Nesse v. Pittman*, 206 F.R.D. 325, 329 (D.D.C. 2002) (holding that notes regarding in-house counsel's ethics investigation were

privileged). Similarly, an attorney-client relationship exists between a federal agency's field office (and its attorneys) and attorneys at the agency's national offices. *See Ocampo v. Harrington*, No. 14-3134, 2015 WL 4910164, at *2 (C.D. Ill. Aug. 17, 2015) (holding that privilege protected communications between (1) Chief Counsel of Immigration and Customs Enforcement in Chicago and (2) Office of Principal Legal Advisor).

### D. Deliberative-Process Privilege

The deliberative-process privilege protects the internal deliberations of government agencies. "Since frank discussion of legal and policy matters is essential to the decisionmaking process of a governmental agency, communications made prior to and as a part of an agency determination are protected from disclosure." *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993). The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). The object of this privilege is "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* (citation and internal quotation marks omitted); *see Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("[T]he writer needs to know at the time of writing that the privilege will apply and that the draft will

remain confidential, in order for the writer to feel free to provide candid analysis.").

To be protected by this privilege, a document must be both "pre-decisional" and "deliberative" – that is, it must be "antecedent" to the adoption of a final decision or policy, and it must be "related to the process" of reaching that decision or policy. *See Enviro Tech Int'l, Inc. v. EPA*, 371 F.3d 370, 374-75 (7th Cir. 2004); *see also Stalcup v. CIA*, 768 F.3d 65, 70 (1st Cir. 2014) ("To satisfy the 'deliberative' element of the [privilege], a document must reflect the give-and-take of the consultative process.") (internal quotation marks omitted). The privilege applies to discussions regarding both "broad-based policy decisions" and "more individualized decision-making," such as "discussions that are part of the process of formulating an official position with respect to internal investigations." *Rodriguez v. City of Chicago*, 329 F.R.D. 182, 186 (N.D. Ill. 2019). It applies to documents regarding internal investigations that set forth "at least some aspect of the state of [an] agency's internal deliberations as to how [an] investigation would or should come out . . . ." *Rodriguez v. City of Chicago*, No. 17 C 7248, 2019 WL 3562683, at *6 (N.D. Ill. Aug. 1, 2019). This privilege can be overcome only by "a sufficient showing of a particularized need to outweigh the reasons for confidentiality." *Farley*, 11 F.3d at 1389.

17

To rely on the deliberative-process privilege, an agency must submit a declaration from "the agency head, one of its high officers, or its counsel" invoking the privilege, identifying and describing the covered documents, and explaining the "precise and certain reasons" for preserving the confidentiality of the documents. *Scott v. City of Peoria*, 280 F.R.D. 419, 428 (C.D. Ill. 2011). An agency head may delegate authority to invoke this privilege to a subordinate official. *See Ferrell v. HUD*, 177 F.R.D. 425, 428 (N.D. Ill. 1998).

Although the deliberative-process privilege does not apply to "purely factual" documents removed from the deliberative process, it protects factual matters that reflect that process. *Enviro Tech Int'l, Inc.*, 371 F.3d at 374-75. "The question is not merely whether the documents contain factual information—or even whether the document is predominantly comprised of findings of fact—but rather the degree to which the facts are indissolubly linked to the broader analysis." *Stalcup*, 768 F.3d at 70. For example, the D.C. Circuit has held that the privilege covers a draft agency history because "the writer necessarily must cull the relevant documents, extract pertinent facts, organize them to suit a specific purpose, and identify the significant issues." *Nat'l Sec. Archive*, 752 F.3d at 465 (internal quotation marks omitted). In other words, the court said, "the selection of the facts thought to be relevant is part of the deliberative process." *Id.*; *accord Missouri Coal. for Env't Found. v. U.S. Army Corps of Engineers*, 542 F.3d 1204, 1211 (8th Cir. 2008) ("Purely

18

factual material may be exempted [from disclosure] if that material would expose the deliberative process of an agency.").

Lastly, "privileges that are intended to facilitate candid communication, such as the deliberative process privilege, generally do not have an expiration date. That makes sense because such a privilege otherwise would not fully serve its purposes." *Nat'l Sec. Archive*, 752 F.3d at 464. That is, "in order for a privilege to encourage frank and candid debate, the speaker or writer must have some strong assurance at the time of the communication that the communication will remain confidential. . . . [T]he Supreme Court has recognized that a privilege designed to encourage candid communications must be durable and lasting." *Id*. at 464-65.

### E.  Grand-Jury Secrecy

"[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Rehberg v. Paulk*, 566 U.S. 356, 374 (2012). This secrecy serves several interests. If such proceedings were made public, "many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 219 (1979) (hereinafter *Douglas Oil*). Also, witnesses before the grand jury "would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements." *Id*. And persons under investigation may otherwise "try to influence individual grand

jurors to vote against indictment." *Id*. Finally, preserving the secrecy of grand jury proceedings avoids "public ridicule" against those who are investigated but not indicted. *See id*.

"[T]he standard for determining when the traditional secrecy of the grand jury may be broken is deliberately stringent." *In re Grand Jury Proceedings, Special Sept., 1986*, 942 F.2d 1195, 1198 (7th Cir. 1991). Specifically, the moving party "must show that the material they seek is needed to avoid a possible injustice in another judicial proceeding, that the need for disclosure is greater than the need for continued secrecy, and that the request is structured to cover only material so needed." *United States v. Tingle*, 880 F.3d 850, 855–56 (7th Cir.), *cert. denied*, 138 S. Ct. 1567 (2018). Even where a requestor establishes the necessary "particularized need," a court must lift grand-jury secrecy only "discretely and limitedly." *Lucas v. Turner*, 725 F.2d 1095, 1101 (7th Cir. 1984). A request for grand jury materials must be "more than a request for authorization to engage in a fishing expedition." *Id.* at 1102.

The need for grand-jury secrecy persists beyond the conclusion of a given investigation and any ensuing prosecution. *See In re Wade*, 969 F.2d 241, 246 (7th Cir. 1992) ("Although the interest in secrecy is greatest during the time the grand jury is conducting its investigation, the need for secrecy does not end with the investigation."). Most of the purposes for grand-jury secrecy – the need to

encourage prospective witnesses, to protect witnesses from "possible retaliation," and to "protect[] the reputations of the innocent" – do not evaporate when the grand jury dissolves. *Illinois v. Abbott & Assocs., Inc.*, 460 U.S. 557, 567 n.11 (1983). Also, "in considering the effects of disclosure on grand jury proceedings, the courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries." *Douglas Oil*, 441 U.S. at 222.

### F.  Privacy Act

The Privacy Act, 5 U.S.C. § 552a, protects the confidentiality of certain federal government records regarding individuals. The Act "fosters the principle that an individual should to the greatest extent possible be in control of information about him which is given to the government." *Bavido v. Apfel*, 215 F.3d 743, 746 (7th Cir. 2000) (internal quotation marks omitted). The Privacy Act generally prohibits the unauthorized disclosure of records contained in a "system of records" in which the records are "retrievable by reference to [an individual's] name." *Bowyer v. U.S. Dep't of Air Force*, 804 F.2d 428, 431 (7th Cir. 1986); *see* 5 U.S.C. § 552a(a)(5), (b); *see also Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010) ("A system of records exists only if the information contained within the body of material is both *retrievable* by personal identifier and actually *retrieved* by

personal identifier.") (internal quotation marks omitted). An employee perform-ance appraisal is one kind of record covered by the Privacy Act. *See Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003-08 (D.C. Cir. 2009). The statute provides both civil remedies and criminal penalties for certain violations. 5 U.S.C. § 552a(g), (i).

### G. Personal Privacy: Other Employment Records

Even where the Privacy Act may not apply, "an employee has at least a minimal privacy interest in his or her employment history and job performance evaluations." *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984). That interest "arises in part from the presumed embarrassment or stigma wrought by negative disclosures." *Id*. But it also reflects an employee's "more general interest" in protecting against the disclosure of the "diverse bits and pieces of information, both positive and negative" that the government obtains and keeps regarding its employees. *Id*. Thus, for example, Exemption 6 of the Freedom of Information Act ("FOIA") protects against the disclosure of "personnel . . . files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," which includes evaluations of an employee's work performance. 5 U.S.C. § 552(b)(6); *Dep't of Air Force v. Rose*, 425 U.S. 352, 377 (1976).

**H. Personal Privacy and Security: Identities of OIG Employees**

Employees of the DOJ Office of the Inspector General and similar investigative agencies have a privacy and security interest in avoiding disclosure of their identities, especially in connection with a specific investigation. For example, the Seventh Circuit has upheld redacting the names of Federal Bureau of Investigation agents from certain investigative materials disclosed under FOIA, noting that identifying the agents "could conceivably subject them to harassment and annoyance in the conduct of their official duties and in their private lives." *Miller v. Bell*, 661 F.2d 623, 630 (7th Cir. 1981), *abrogated on other grounds by DOJ v. Landano*, 508 U.S. 165 (1993); *see Stephens v. IRS*, No. 82 C 0421, 1984 WL 744, at *4 (N.D. Ill. Jan. 27, 1984) (approving withholding name of IRS employee involved in investigation).

Even closer to this case, another appellate court has approved withholding the names of employees in the Office of the Inspector General of the Department of Labor when producing certain records under FOIA. *See New England Apple Council v. Donovan*, 725 F.2d 139, 143 (1st Cir. 1984). The court noted that "[t]he functions of OIG investigators are not so different from the functions of FBI agents as to warrant divergent treatment under FOIA . . . . OIG investigators do not lose all of their privacy concerns simply by serving as public officials." *Id.* at 143; *accord O'Keefe v. U.S. Dep't of Def.*, 463 F. Supp. 2d 317, 326 (E.D.N.Y. 2006)

(stating that "investigative personnel [in Office of Inspector General of the Department of Defense] have significant privacy interests as they may be subject to harassment or embarrassment if their identities are disclosed").

## II. Most of the Content of the Tim Bass/OIG Emails Is Irrelevant, and Portions of Them Are Protected by the Work-Product Doctrine, Grand-Jury Secrecy, the Privacy Act, and Personal Privacy and Security

The content of the Tim Basss/OIG Emails and their attachments – the largest set of documents involved in Nixon's motion – falls into four categories:

- Emails in which AUSA Tim Bass complained of alleged wrongdoing by personnel in the U.S. Attorney's office in connection with *United States v. Schock* and asked OIG to investigate.

- Communications among AUSA Bass and his supervisors in the U.S. Attorney's office and other personnel regarding the handling of *Schock* and the drafting of filings for that case.

- Transcripts of grand jury proceedings.

- A performance appraisal for AUSA Bass.

Additionally, many of these emails contain the names of employees in the DOJ Office of the Inspector General.

Most of the information in these emails is irrelevant to Nixon's motion for new trial because it relates to other litigation and does not refer to any communications between Judge Colin Bruce and the U.S. Attorney's office. Also, portions

of the emails or their attachments are protected by the work-product doctrine, grand-jury secrecy, the Privacy Act, and personal privacy and security.

First, this Court should deny Nixon's request for the unredacted production of the Tim Bass/OIG Emails because most of the content of these documents is irrelevant to Nixon's motion for new trial. Addressing each of the above categories in turn:

- AUSA Bass's emails complaining of alleged wrongdoing by personnel in the U.S. Attorney's office relate to *United States v. Schock*, not this case. To the extent these emails refer to communications between Judge Bruce and the U.S. Attorney's office, the government has produced those portions without redaction.

- The transcripts of grand jury proceedings also relate to *Schock*, not this case, and they say nothing about this case or about any communications between the U.S. Attorney's office and Judge Bruce.

- The performance appraisal for AUSA Bass says nothing about this case or about any communications between the U.S. Attorney's office and Judge Bruce.

- The names of OIG employees who corresponded with AUSA Bass have no bearing on Nixon's motion for new trial, and those employees would have

no independent information regarding communications between Judge Bruce and the U.S. Attorney's office.

Second, certain of the email attachments – specifically, the communications among AUSA Bass, Acting U.S. Attorney Patrick Hansen, Criminal Chief John Childress, and other personnel in the office regarding the handling of *Schock* and the drafting of filings for that case – are protected by the work-product doctrine. These communications were created during "actual ongoing litigation" and reflect the thought processes and mental impressions of attorneys. *See Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 621-22 (7th Cir. 2010); *Harper v. United States Beef Corp.*, No. 15-3112, 2018 WL 3863525, at *2 (C.D. Ill. July 20, 2018). Compelling the government to disclose these communications would invade the "zone of privacy" needed for attorneys to prepare for litigation "free from scrutiny or interference by an adversary." *See Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006).

The recent termination of *United States v. Schock* does not affect the strength of these concerns.[7] *See Hobley*, 433 F.3d at 949. Disclosing these communications would reveal the U.S. Attorney's office's internal processes and chill the

---

[7] The court in *Schock* entered an order on September 20, 2019, noting that the government had dismissed the remaining counts in the indictment. *See United States v. Aaron J. Schock*, No. 16-cr-30061 (C.D. Ill.), Doc. 212.

openness of internal discussions regarding the handling of future litigation. Moreover, the high-profile nature of that case, involving a former member of Congress, heightens the need to protect these discussions and would increase the damage from compelled disclosure.

Third, the grand jury transcripts from *Schock* attached to one of the emails are protected by grand-jury secrecy. These transcripts set forth colloquies between certain AUSAs and members of the grand jury, reflecting the work and thought processes of the grand jury, including the evidence presented to it. Thus, disclosing these transcripts would endanger "the proper functioning of [the] grand jury system," by, among other things, identifying witnesses who testified, affecting the willingness of potential witnesses to testify to other grand juries, and facilitating efforts to influence grand juries. *See Rehberg v. Paulk*, 566 U.S. 356, 374 (2012); *Douglas Oil*, 441 U.S. at 219.

Fourth, the Performance Work Plan and Appraisal Record for AUSA Bass attached to one of the emails is protected by the Privacy Act. That statute generally prohibits the unauthorized disclosure of records contained in a "system" in which records are "retrievable by reference to [an individual's] name." *Bowyer v. U.S. Dep't of Air Force*, 804 F.2d 428, 431 (7th Cir. 1986). An employee performance appraisal is one such record. *See Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003-08 (D.C. Cir. 2009).

Fifth and finally, the names of employees in the DOJ Office of the Inspector General that appear in these emails should be withheld based on personal privacy and security. As the courts – including the Seventh Circuit – recognize, "[o]ne who serves his state or nation as a career public servant is not thereby stripped of every vestige of personal privacy, even with respect to the discharge of his official duties." *Miller v. Bell*, 661 F.2d 623, 630 (7th Cir. 1981); *see New England Apple Council v. Donovan*, 725 F.2d 139, 143 (1st Cir. 1984) ("OIG investigators do not lose all of their privacy concerns simply by serving as public officials."). The identities of these OIG employees should be withheld to prevent "harassment and annoyance in the conduct of their official duties and in their private lives." *Miller*, 661 F.2d at 630; *see O'Keefe v. U.S. Dep't of Def.*, 463 F. Supp. 2d 317, 326 (E.D.N.Y. 2006) (approving redaction of names of Department of Defense OIG employees to prevent "harassment or embarrassment").

## III. The Tim Bass/PRAO Email Is Protected by the Attorney-Client Privilege and the Work-Product Doctrine, and Most of Its Content Is Irrelevant

AUSA Tim Bass forwarded some of his communications with OIG to the DOJ Professional Responsibility Advisory Office. Those emails, as forwarded to PRAO, are protected by the attorney-client privilege because PRAO is responsible for advising Assistant U.S. Attorneys and other DOJ attorneys on issues of professional responsibility. *See* About the Office, https://www.justice.gov/

prao/ about-office (last visited Nov. 13, 2019). Thus, AUSA Bass sent his email to PRAO "for the purpose of obtaining legal advice," *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) – specifically, advice regarding ethical issues. *See United States v. Rowe*, 96 F.3d 1294, 1296 (9th Cir. 1996) (holding that attorney-client privilege absolved law firm associates of need to comply with grand jury subpoena regarding in-house investigation of partner's handling of client funds); *Nesse v. Pittman*, 206 F.R.D. 325, 329 (D.D.C. 2002) (holding that notes regarding in-house counsel's ethics investigation were privileged).

AUSA Bass's email to PRAO is also protected by the work-product doctrine. Much of the content of the forwarded emails relates to "actual ongoing litigation" – that is, *United States v. Schock* – and reflects Mr. Bass's thought processes and mental impressions. *See Sandra T.E.*, 600 F.3d at 621-22. Additionally, in light of the pendency of *Schock* and his role as an AUSA, Mr. Bass necessarily sought PRAO's advice in anticipation of possible litigation or a state bar proceeding – which can be "of an adversarial nature sufficient to constitute 'litigation'" – regarding his professional conduct. *Cf. McCook Metals L.L.C. v. Alcoa Inc.*, 192 F.R.D. 242, 262 (N.D. Ill. 2000). *See Caldwell v. Brown*, No. C09-1332RSL, 2010 WL 1837717, at *3 (W.D. Wash. May 3, 2010) (holding that work-product doctrine applied to documents created in anticipation of state bar complaint proceeding).

Finally, much of the content of the OIG emails that AUSA Bass forwarded PRAO is irrelevant to this action. The emails relate primarily to *United States v. Schock* and say nothing about this action. To the extent the emails refer to communications between Judge Bruce and the U.S. Attorney's office, the government has given that material to Nixon without redaction in the underlying emails from Mr. Bass to OIG.

## IV. The Bass/Pierson Emails Are Protected by the Work-Product Doctrine, and Most of Their Content Is Irrelevant

In the Bass/Pierson Emails of May 2018, two AUSAs in the Central District of Illinois discussed how to handle a December 2016 email exchange between Judge Bruce and Lisa Hopps, a paralegal in the U.S. Attorney's office. They discussed that subject in connection with *United States v. Schock*, which AUSA Bass was handling, and *United States v. Nixon*, which AUSA Pierson was handling. On one of the emails, AUSA Bass copied supervisory AUSA Eugene Miller.

Such documentation of internal discussions among attorneys for the Federal Government is quintessential work product because it conveys the mental impressions and thought processes of the participating attorneys in relation to pending litigation. *See Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 621-22 (7th Cir. 2010). The subject communications must be protected to preserve the "zone of privacy" needed for attorneys to prepare for litigation "free from

30

scrutiny or interference by an adversary." *Hobley v. Burge*, 433 F.3d 946, 949 (7th Cir. 2006).

Additionally, most of the content of these emails is irrelevant to Nixon's motion for new trial. AUSAs Bass and Pierson primarily discussed their consultations with other DOJ offices regarding the disclosure of the Bruce/Hopps exchange in litigation. Moreover, to the extent the emails refer to Judge Bruce's communications with the U.S. Attorney's office, they convey personal views rather than any stand-alone facts.

## V.  The Lisa Hopps Memorandum to EOUSA Is Protected by the Deliberative-Process Privilege and the Work-Product Doctrine, and Much of Its Content Is Irrelevant

In a memorandum to the Principal Deputy Director of the Executive Office for United States Attorneys, paralegal Lisa Hopps expressed her views on various issues and asked EOUSA and the Department of Justice to take certain action regarding the handling of *Schock*. Disclosure of this document is foreclosed by the deliberative-process privilege and the work-product doctrine. First, the memorandum is "pre-decisional" because it preceded any decision by the Department to take any action in response to Ms. Hopps's complaints, and it is "deliberative" because it "reflect[s] the give-and-take of the consultative process." *Stalcup v. CIA*, 768 F.3d 65, 70 (1st Cir. 2014); *see* Declaration of Bradley

31

Weinsheimer ¶¶ 4-5 (Attachment 1 hereto). Compelling disclosure of this docu-

ment would significantly chill the willingness of AUSAs and other DOJ attorneys

who seek action by EOUSA or the Department from speaking "candidly" in such

communications. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532

U.S. 1, 8-9 (2001); Weinsheimer Decl. ¶ 5.

Second, the Hopps/EOUSA memorandum is also protected by the work-

product doctrine, like the emails between AUSAs Bass and Pierson discussed

above. This document was prepared to analyze issues regarding the handling of

*Schock* and to prepare for future developments in that litigation. *See United States*

*v. Smith*, 502 F.3d 680, 689 (7th Cir. 2007). It reflects the writer's "thought

processes and mental impressions" in relation to the litigation. *Sandra T.E. v. S.*

*Berwyn Sch. Dist. 100*, 600 F.3d 612, 621-22 (7th Cir. 2010). Although the work-

product doctrine usually focuses on attorneys, it also applies to the work of

paralegals, "whether the paralegal is viewed as an extension of the attorney or as

another representative of the party itself." *Fine v. Facet Aerospace Prod. Co.*, 133

F.R.D. 439, 445 (S.D.N.Y. 1990).

Finally, in any event, much of this document is also irrelevant to Nixon's

motion for new trial. Some eighty percent of the memorandum does not relate to

Judge Bruce at all. Even where it refers to Judge Bruce, the memorandum

primarily describes Ms. Hopps's impressions regarding the judge's relationship with AUSA Bass specifically rather than with the U.S. Attorney's office overall.

## VI. The Email Summarizing a Judge's Feedback on AUSA Performance Is Protected by the Deliberative-Process Privilege and Personal Privacy, and Is Irrelevant

Supervisory AUSA Eugene Miller received oral feedback from Judge Bruce regarding the performance of one of the other AUSAs in the office, and Mr. Miller sent an email to himself to record that feedback. This document is protected by both the deliberative-process privilege and considerations of personal privacy, and, in any event, it is irrelevant to Nixon's motion for new trial.

First, AUSA Miller, as a supervisor in the U.S. Attorney's office, obviously recorded the judge's feedback to facilitate taking some official action, either to correct any problems described by the judge or to incorporate the feedback into a performance evaluation. The email, therefore, is "pre-decisional" in that it preceded a decision to take such action, and it is "deliberative" in that it reflects the "consultative process." *Stalcup v. CIA*, 768 F.3d 65, 70 (1st Cir. 2014). And although AUSA Miller was recording Judge Bruce's feedback rather than Mr. Miller's own first-hand impressions regarding the work of an AUSA under his supervision, the email necessarily reflects AUSA Miller's selection, emphasis, and organization, such that its disclosure would "expose the deliberative

33

process." *See Missouri Coal. for Env't Found. v. U.S. Army Corps of Engineers*, 542

F.3d 1204, 1211 (8th Cir. 2008); *see Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C.

Cir. 2014) (noting that agency employee-writer "necessarily must cull the

relevant documents, extract pertinent facts, organize them to suit a specific

purpose, and identify the significant issues"). Removing protection from AUSA

Miller's email would discourage DOJ supervisors from recording "candidly" the

oral feedback they receive from judges on the performance of DOJ attorneys. *See*

*Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001).

Second, disclosing this document would invade the other AUSA's "privacy

interest in his or her employment history and job performance evaluations."

*Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984). The disclosure of any "negative"

feedback from Judge Bruce could occasion "embarrassment and stigma." *Id*. This

document is the kind of "personnel [file] the disclosure of which would consti-

tute a clearly unwarranted invasion of personal privacy," whose disclosure is

exempted under FOIA. 5 U.S.C. § 552(b)(6); *see Dep't of Air Force v. Rose*, 425 U.S.

352, 377 (1976).

Additionally, AUSA Miller's email is entirely irrelevant to Nixon's motion

for new trial. The email does not refer to this case or to Judge Bruce's relationship

with the U.S. Attorney's office in general. Nor does the mere existence of the

email reflect any relevant information regarding the judge's relationship with the

office; it should not be surprising that a judge would provide feedback to a U.S.

Attorney's office regarding the past performance of an AUSA in the judge's

district.

## CONCLUSION

For these reasons, this Court should deny Nixon's motion to compel the

unredacted production of the subject documents.

Dated:  November 15, 2019

Respectfully submitted,

JOHN C. MILHISER
*United States Attorney*

  /s/ W. Scott Simpson
*Assistant United States Attorney*

*Office of the United States Attorney*
*318 South Sixth Street, Room 220*
*Springfield, Illinois 61602-1806*
*Telephone:  217-492-4413*
*Email:       w.scott.simpson@usdoj.gov*

## CERTIFICATE OF SERVICE

I certify that on November 15, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Central District of Illinois by using the CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

 /s/ W. Scott Simpson
*Assistant United States Attorney*